2012 Ark. App. 111
**William E. FLYNN, Appellant**

v.

**J.B. HUNT TRANSPORTATION, Appellee.**

**No. CA 11–525.**

Court of Appeals of Arkansas.

Feb. 1, 2012.

Joseph Houston Purvis, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellant William Flynn appeals from the Workers' Compensation Commission's opinion finding that his alleged back injury was not compensable. On appeal, Flynn argues that substantial evidence does not support the Commission's decision. We affirm.

A hearing was held before an administrative law judge (ALJ) on April 5, 2010, to determine, among other things, whether Flynn sustained a compensable injury to his low back as the result of cumulative trauma over time or a specific incident on or about February 5, 2009. Flynn appeared pro se. He testified that he began working as a truck driver for J.B. Hunt in November 2007 and that he had a strong back at that time. He testified that from 1976 until February 2009, he had helped his wife on the farm with hay baling every summer and cut and split firewood in the winter. A preemployment physical in November 2007 noted that he had no previous surgeries, deformities, or limitations of motion to his spine.

Flynn claimed he had his first experience with serious back pain in February 2008, after having been assigned to a defective truck with a bad seat and a bad mattress. He complained about this and sent letters to his superiors describing the problem, although by then it had been resolved by his being moved to another truck. He claimed that within a few days of changing trucks, the back pain went away. Flynn stated that he stayed in the good truck until Christmas 2008, when he complained that his supervisor was trying to get him to do something that he felt was unsafe. The supervisor responded by telling him that he had a complaint about his driving. Flynn returned to Lowell, Arkansas, for a review of the complaint and was told that the truck he was driving had been sold and he would get another truck.

He was assigned to one of the best trucks in the fleet for a few weeks before being told to return to Lowell and turn that truck in because it needed its engine rebuilt. However, he claimed that maintenance records show that the truck was cleaned, detailed, and sent back out. After turning that truck in, Flynn was eventually assigned a truck out of Memphis. He testified that this truck was in bad condition, but he had to accept it in compliance with J.B. Hunt's policy.

Flynn left Memphis in this truck on February 1, 2009, driving to Louisiana. On February 2, he reported that the defects in this truck were causing him back pain. He was instructed to continue driving and complete his load. He testified that on February 4 at approximately 5:30 p.m., a combination of circumstances resulted in an injury when he was required to use the air horn and the brakes to avoid a collision with a vehicle that was entering the highway. He described that while applying the brakes and the air horn, the truck hit a bump of some kind in the road and the steering column collapsed, causing the steering wheel and his body to suddenly move forward. He said this resulted in very sudden and severe pain in his back. Flynn pulled off the highway and into a closed gas station. He parked there for the night and informed dispatch of the situation. His dispatcher asked him if he could continue, and he said he would try to deliver the load. At 6:30 a.m. on February 5, Flynn attempted to drive the truck, but he could not operate the clutch because he did not have enough use of his left leg without severe pain in his back. He had driven no more than ten minutes when he pulled off into a rest area. Later that morning, a security guard knocked on the door of the truck, but Flynn could not get up from lying down. He testified that he could not raise his back, head, or legs. He

yelled to answer the knock, and the man got in the truck and called an ambulance. Flynn testified that the ambulance personnel helped him out of the truck, administered morphine, and transported him to Santa Rosa Medical Center.

Flynn testified that the hospital wanted him to stay overnight for x-rays and an MRI, but they had to have it approved by his employer. Flynn talked with two J.B. Hunt employees and was told that they wanted him to get treatment at a hospital closer to home. He was injected with steroids and painkillers, and he flew home. Flynn testified that he was in severe, debilitating pain at this time, and he could barely crawl from his bed to the bathroom with his wife's help. He said that he even had serious pain lying in bed, and once the medication from the hospital wore off he was just as bad, if not worse, as when he was removed from the truck. After six days, J.B. Hunt got him an appointment to see Dr. Snider.

On February 12, 2009, Flynn saw Dr. Snider, who gave him an injection, prescribed medication, and ordered physical therapy. Dr. Snider's assessment was that Flynn had a lumbar strain. Flynn testified that the injection and the pills gave him mobility so he could do physical therapy. He saw Dr. Snider again on February 26, and Dr. Snider decided he should be off work for six weeks. Flynn said he was later told that the insurance company was not paying for any more physical therapy sessions and that he had to go back to the doctor. He said when he went back to Dr. Snider on March 19, he got a return-to-work letter for March 23. Flynn testified that he called his dispatcher that day and faxed him a copy of the letter. He claimed the dispatcher said he would call back the next day but he did not. After not hearing from him for a couple of days, Flynn called the dispatcher

and asked him what was going on. Flynn was told that he was fired due to a driving complaint.

After four or five days without pain medication, Flynn went to see his family doctor, Dr. Dugan. He got a prescription and was told he needed to see an orthopedist. Flynn saw Dr. Dugan again in March 2010, and Dr. Dugan said that the prescription he was on was not a solution and that he still needed to see an orthopedist. He was referred to Dr. Clarke and saw him on March 9, 2010. X-rays were taken which Dr. Clarke said showed "a minor grade 1 spondylolisthesis at L5–S1 with pars defect," "minor degenerative changes," and "maybe a very minor compression fracture of T12."

Flynn testified that he currently experiences a constant backache, and he feels like there is a lump on the inside of his lower mid-back. He has muscle spasms almost on a daily basis, but they are not as serious since he started taking ibuprofen. The spasms are on his right side above the "lump" and below his shoulder blade. He cannot stand for more than a couple hours at a time or sit for more than four hours. Even lying down hurts sometimes. He says the pain has been noted as migrating because there are two injuries—the disc and the fracture. On cross-examination, Flynn admitted that there was no mention of the steering-column incident in the emergency room records or Dr. Snider's records.

Wesley Griffin testified that he handles legal matters for J.B. Hunt, and that complaints against drivers come to the people that work for him. He testified that Flynn had five driving complaints in the twelve months ending in February 2009. These related to improper turns, improper lane changes, following too close, and things of that nature. Griffin said that after the fourth complaint, Flynn was suspended for

three days in December 2008, and he was told that any further complaints would result in further discipline, including termination. Griffin testified that the final complaint was on February 4, 2009. Griffin said that the decision to terminate Flynn was made on February 4, 2009, but he was not terminated until March 23, 2009. He said that J.B. Hunt was notified of Flynn's back problem on February 5, 6, or 7, 2009. He said they waited so long to terminate him because they typically want to terminate people in person, so they route the driver to the terminal to secure the equipment. Since Flynn never made it to the terminal, Griffin said they waited until he was released by the doctor. Griffin testified that no work was performed upon the complaints of a defective seat and steering column in that truck. He claimed that the seat is still in the truck and that there have been no repairs nor complaints.

In determining the compensability of Flynn's alleged back injury, the ALJ found that Flynn had proved the existence of an injury established by medical evidence supported by objective findings. However, the ALJ found that Flynn had not proved that his injury arose out of and occurred in the course of his employment. The ALJ entered his opinion on June 25, 2010, and Flynn appealed to the Commission. The Commission entered an opinion on January 28, 2011, affirming and adopting the decision of the ALJ. Flynn now appeals to this court.

Flynn argues that his claim has been proved by a preponderance of the evidence and that there is no substantial evidence to support the Commission's decision. In appeals involving claims for workers' compensation, we view the evidence in the light most favorable to the Commission's decision and affirm the decision if it is supported by substantial evidence. *Leach v. Cooper Tire & Rubber Co.,* 2011 Ark.

App. 571, 2011 WL 4477865. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Id.* The issue is not whether the appellate court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm. *Id.*

Appellee argues that substantial evidence supports the Commission's decision because Flynn failed to establish that his condition arose out of and occurred in the course of his employment. They claim that the only evidence supporting Flynn's claim is his own testimony, and the uncorroborated testimony of an interested party is never to be considered uncontradicted. *Continental Express v. Harris,* 61 Ark. App. 198, 965 S.W.2d 811 (1998). Appellee argues that Dr. Snider's and Dr. Clarke's opinions as to the cause of Flynn's back problems are completely reliant on the accuracy of the history Flynn gave them. Furthermore, appellee argues that Flynn was not a credible witness because his statements to his medical providers concerning the source of his complaints differ markedly from his hearing testimony. Appellee argues that it defies logic that if, in fact, Flynn's back problems arose from the specific steering-wheel incident, he would not have relayed such key information to any of the first three medical providers he saw. Not until Flynn's appointment with Dr. Clarke in 2010 did the records specifically mention the steering-wheel incident.

Appellee also argues that it is important to consider that Flynn had been involved in various conflicts with his supervisors and had just been the recipient of his fifth driving complaint. The claim of conflicts is supported by letters Flynn introduced into the record that he had written to several of his superiors at J.B. Hunt complaining of unfair treatment by his supervi-

sor. Appellee also argues that Flynn's subjective complaints significantly exceed his clinical findings and that the exact location of his back injury is unclear. Appellee argues that with all of these questions and inconsistencies, there are many potential causes for Flynn's back injury, but none were proven by a preponderance of the evidence. Appellee argues that Flynn was not credible and that, because the Commission is the sole evaluator of the credibility of a witness, we should defer to it and affirm.

Flynn argues in his reply brief that he did accurately and completely describe the events leading up to his injury to his medical providers. When questioned at the hearing, Flynn stated that it was not surprising that the hospital records did not recount the ₈steering-wheel incident because he did not think the hospital was particularly concerned with that. Flynn argues that the steering-wheel incident exacerbated his pain, but he never claimed it was the primary pain-creating incident. Finally, Flynn argues that there is no evidence to suggest that his injury was caused by anything other than his work at J.B. Hunt.

 In order to prevail on a claim for a compensable injury, the claimant must prove that the injury arose out of and in the course of his employment. Ark.Code Ann. § 11–9–102 (Supp.2011). The causal connection between the injury and employment is generally a matter of inference, and possibilities may play a proper role in establishing that relationship. *Gencorp Polymer Prods. v. Landers*, 36 Ark.App. 190, 820 S.W.2d 475 (1991). The ALJ, and in turn the Commission, found that Flynn's testimony regarding the nature of his complaints and the circumstances surrounding the onset of his complaints conflicted with his statements to his medical providers. Additionally, the ALJ found that the histo-

ries varied between the medical providers. The ALJ also found that Flynn believed he was intentionally being assigned trucks in poor condition to cause him to quit his job, and the ALJ was concerned that this belief may have influenced his claim of a work-related back injury. The ALJ concluded that Flynn's injury could have had a number of causes and that a causal relationship between the medically documented injuries and Flynn's employment was not proved.

 Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Long v. Wal–Mart Stores, Inc.,* 98 Ark.App. 70, 250 S.W.3d 263 (2007). When there are contradictions in the ₉evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.* The ALJ and the Commission did not believe Flynn's testimony that his injury arose out of and in the course of his employment. Determining Flynn's credibility was within the exclusive province of the Commission, and we hold that there is substantial evidence to support the Commission's decision. Thus, we affirm.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.